UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RANDY BERKSHIRE,                              Case No. 12-12038

　　　　　　　Plaintiff,                       Arthur J. Tarnow
v.                                           United States District Judge

DEBRA DAHL, *et al.*,                        Stephanie Dawkins Davis
                                             United States Magistrate Judge

　　　　　　　Defendants.
_____/

## REPORT AND RECOMMENDATION
## MOTIONS FOR SUMMARY JUDGMENT (Dkt. 183, 193, 200)

## I.　PROCEDURAL HISTORY

Plaintiff filed a *pro se* prisoner civil rights lawsuit on May 7, 2012.  (Dkt. 1).  On June 12, 2012, this matter was referred Magistrate Judge Michael Hluchaniuk for all pretrial proceedings.  (Dkt. 9).  On August 11, 2014, Judge Hluchaniuk issued a report and recommendation (RR) on the motion for summary judgment filed by defendants Sermo, Beauvais, LeDuc, and Dahl and the motion for summary judgment filed by defendant Pozios.  (Dkt. 129).  On November 12, 2014, District Judge Arthur J. Tarnow adopted that RR in part.  (Dkt. 138).

Contrary to the RR, Judge Tarnow found that the plaintiff stated a *prima facie* case of retaliation against Dahl.  Notably, only causation was at issue in that motion for summary judgment.  (Dkt. 138, Pg ID 1959).  As to defendants Pozios,

Beauvais, and Sermo, Judge Tarnow concluded that Brent Lang's (another prisoner) affidavit provided sufficient evidence from which a reasonable jury could infer that these defendants had the requisite culpability to satisfy the subjective prong of the deliberate indifference standard.  (Dkt. 138, Pg ID 1960). Judge Tarnow agreed with the RR that defendant LeDuc should be dismissed from the suit because even if he did have a duty to offer plaintiff more frequent bathroom breaks, breach of that duty was not clearly unlawful.  *Id*. at Pg ID 1961 (citing *Robertson v. Lucas*, 753 F.3d 606, 621 (6th Cir. 2014)).

As to defendant Pozios, Judge Tarnow agreed with the recommendation that his motion for summary judgment should be denied.  Judge Tarnow rejected Pozios' objection that plaintiff failed to establish a serious medical need on March 30, 2012, the date pertinent to Pozios.  (Dkt. 138, Pg ID 1961-62).  Judge Tarnow also rejected Pozios' argument that the Lang affidavit was insufficient to create a genuine issue of material fact as to the subjective prong of the deliberate indifference test.  Judge Tarnow agreed with the RR that it was improper to make credibility determinations at the summary judgment stage and rejected Pozios' argument that the Court should believe his word over Lang's.  *Id*. at Pg ID 1963. Finally, Judge Tarnow rejected Pozios' objection that the RR failed to consider plaintiff's deliberate noncompliance with treatment.  Judge Tarnow concluded:

> Plaintiff's non-compliance with any prescribed
> medication is irrelevant to the determination of

2

> deliberate indifference here because medication
> non-compliance is a symptom of mental illness. It is
> incongruous to accuse a person who has to be restrained
> from banging his head against the wall of deliberately
> taking any course of action. Given the particular nature
> of Plaintiff's illness, it would be illogical to impute
> rationality to his resistance to medication. All of the
> cases that Defendant cites in support of this argument are
> both distinguishable from the facts here and are not
> binding on this Court.

(Dkt. 138, Pg ID 1963).

After the first round of summary judgment motions were decided, Judge

Hluchaniuk entered an order for appointment of counsel and stayed the case.

(Dkt. 142). *Pro bono* counsel was finally located and appointed on June 8, 2015.

(Dkt. 154). After a status conference, Judge Hluchaniuk issued a bench order

setting a discovery deadline of October 26, 2015 and a dispositive motion deadline

of November 25, 2015. (Dkt. 158). Defendant Nelson withdrew his pending

motion for summary judgment. (Dkt. 157). On October 27, 2015, expert

discovery was extended and a new dispositive motion deadline of February 17,

2016 was put in place. (Dkt. 164). Then, on February 10, 2016 a second

stipulated amended scheduling order was signed by the Court, setting a dispositive

motion deadline of April 15, 2016. (Dkt. 178).

On April 14, 2016, plaintiff filed his motion for partial summary judgment

against Dahl on the issue of liability. (Dkt. 183, 184). Defendants Beauvais,

Dahl, Nelson, Sermo, and Pozios filed motions for leave to file a second motion

for summary judgment, which were granted by text-only order.  (Dkt. 185, 188).

Defendants Beauvais, Dahl, Nelson, and Sermo filed their second summary

judgment motion April 20, 2016.  (Dkt. 193).  Pozios filed his second motion for

summary judgment on May 10, 2015.  (Dkt. 200).  The parties have filed

responses and replies to the various motions for summary judgment.  (Dkt. 199,

230, 212, 213, 217, 221, 222, 226).  The parties have also filed joint statements of

resolved and unresolved issues.  (Dkt. 236, 238, 237).  The Court held a hearing

on September 15, 2016.

        This matter is now ready for report and recommendation.  For the reasons

set forth below, the undersigned **RECOMMENDS** that plaintiff's motion for

partial summary judgment against defendant Dahl be **GRANTED**, that Dahl's

motion for summary judgment be **DENIED**, that defendant Nelson's motion for

summary judgment be **GRANTED**, and that both motions for summary judgment

by the remaining defendants (Pozios, Beauvais, and Sermo) be **DENIED**.

## II.    PLAINTIFF'S AMENDED COMPLAINT

        Plaintiff filed his second amended complaint on November 18, 2013.  (Dkt.

101).  In his second amended complaint, plaintiff claims that defendant Dahl

discharged him from the Residential Treatment Program (RTP), in retaliation for

complaints that plaintiff had made.  (Dkt. 101, ¶¶ 2-3).  Plaintiff was elected as a

Housing Unit Representative (HUR) in March 2012.  (Dkt. 101, ¶ 2).  On March

19, 2012, plaintiff submitted a three page complaint (the "Agenda") to RUM

Wilson and defendant Dahl addressing several concerns on behalf of himself and

other prisoners in the RTP amounting to possible constitutional violations. *Id*.

Agenda, which Mr. Berkshire wrote after careful research of MDOC policies,

identified six separate concerns raised by the RTP residents and the corresponding

MDOC policies that were being violated by the prison in not addressing the

concerns.  For instance, one of the complaints in the Agenda was that

some RTP residents were not being permitted access to the materials in the law

library.  The Agenda also pointed out that the alleged lack of access violated a

specific MDOC Policy Directive.   Days later, on March 21, 2012, according to

plaintiff Dahl changed his GAF score to 53, intentionally downgraded all of his

diagnoses by March 22, 2012, and was responsible for his retaliatory discharge

from RTP. *Id*.  According to the amended complaint, Dahl discharged him from

RTP without a mental health assessment, diagnostic evaluation and treatment or

disposition planning as called for under applicable operating procedures.  Plaintiff

was then transferred to a lower level of care where fewer privileges were offered

and more restrictions imposed.  (Dkt. 101, ¶ 3).

Plaintiff asserts that defendant Beauvais issued a misconduct ticket for

threatening behavior and placed him in segregation after his Business Education

Technology teacher relayed to Beauvais that plaintiff seemed mentally unstable,

and plaintiff expressed homicidal ideation to Beauvais. *Id*. at ¶ 4. Once in

segregation, plaintiff stopped eating food and drinking liquids. Within days he

was discovered unresponsive in his cell and rushed to the hospital. *Id*. at ¶ 5.

When he was returned to his cell, he continued to decline food and liquids but was

not placed in an observation cell or prescribed any psychotropic medications.

Plaintiff's continued refusal of food and liquids apparently led to another

health challenge, when, on April 2, 2012 he alleges that he was once again found

unresponsive in his cell lying in his own excrement. *Id*. At ¶¶ 8-10. Following

that health episode, plaintiff claims that on April 3, 2012, defendant Sermo

conducted a face-to-face interview that lasted only five minutes. Appropriate

treatment was discussed. *Id*. at ¶ 11. The next day, plaintiff attended the hearing

on the ticket written by defendant Beauvais. Plaintiff claims that defendant Sermo

completed a Misconduct Sanction Screening form, which enabled the hearing

officer to impose the maximum sanction. Plaintiff was found guilty. *Id*. at ¶ 12.

From April 4, 2012 through April 9, 2012, plaintiff continued to deprive

himself of food and water. (Dkt. 101, ¶ 13). On April 9, 2012, plaintiff attempted

suicide by hanging himself in his cell. Staff restrained him, but refused to call

health services and no medical treatment was provided. (Dkt. 101, ¶ 14). The

staff also removed all property from plaintiff's cell and placed restraints on his

hands and feet. Plaintiff's complaint says he was forced to lay on the cold

concrete and that he injured himself by banging his head against the wall.  Plaintiff was then placed in four-point top-of-bed restraints, which he says were painful. He was then placed in five-point top-of-bed restraints.  (Dkt. 101, ¶ 15). Defendant Nelson came into plaintiff's cell after midnight that same night, but refused to allow plaintiff a bathroom break.  *Id*. at ¶ 17.

Next, while plaintiff was in top-of-bed restraints, defendants Sermo and Beauvais entered his cell and told plaintiff that he was being transferred to the Crisis Stabilization Program (CSP).  *Id*. at ¶ 23.  Plaintiff asserts that defendants Beauvais and Sermo (as well as defendant Pozios) were subjectively aware that he was at risk of suicide before April 9, 2012, but failed to take appropriate measures, resulting in plaintiff's attempted suicide.  *Id*. at ¶ 26.  In his "Statement of Claim," plaintiff alleges that defendant Dahl's actions constituted First Amendment retaliation and that the actions of defendants Nelson, Sermo, Pozios, and Beauvais constituted deliberate indifference in violation of the Eighth Amendment.  *Id*. at ¶¶ 28-30.  Additional facts will be discussed in detail below where relevant to the analysis of the parties' respective motions.

## III.    ANALYSIS AND CONCLUSIONS

### A.    <u>Standard of Review</u>

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A party

asserting that a fact cannot be or is genuinely disputed must support that assertion

by: (A) citing to particular parts of materials in the record...; or (B) showing that

the materials cited do not establish the absence or presence of a genuine dispute,

or that an adverse party cannot produce admissible evidence to support the fact."

Fed.R.Civ.P. 56(c)(1). The standard for determining whether summary judgment

is appropriate is "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d

433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

251-52 (1986). Furthermore, the evidence and all reasonable inferences must be

construed in the light most favorable to the non- moving party. *Matsushita Elec.

Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact,

the burden of demonstrating the existence of such an issue shifts to the

non-moving party to come forward with "specific facts showing that there is a

genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

That is, the party opposing a motion for summary judgment must make an

affirmative showing with proper evidence and must "designate specific facts in

affidavits, depositions, or other factual material showing 'evidence on which the

jury could reasonably find for the plaintiff.'"  *Brown v. Scott*, 329 F.Supp.2d 905,

910 (6th Cir. 2004).

In order to fulfill this burden, the non-moving party need only demonstrate

the minimal standard that a jury could ostensibly find in his favor.  *Anderson*, 477

U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

However, mere allegations or denials in the non-movant's pleadings will not

satisfy this burden, nor will a mere scintilla of evidence supporting the

non-moving party.  *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute

about a material fact, that is, if the evidence in the case "is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Such a determination requires that the Court "view the evidence presented through

the prism of the substantive evidentiary burden" applicable to the case.  *Id*. at 254.

Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of

the evidence, on a motion for summary judgment the Court must determine

whether a jury could reasonably find that the plaintiff's factual contentions are true

by a preponderance of the evidence.  *See id.* at 252-53.  Finally, if the nonmoving

party fails to make a sufficient showing on an essential element of its case with

respect to which it has the burden of proof, the movant is entitled to summary

judgment. *Celotex*, 477 U.S. at 323.  The Court must construe Rule 56 with due

regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

B.   <u>Successive motions for summary judgment</u>

According to plaintiff, the Court need not and should not consider the arguments raised by Pozios, Dahl, Beauvais, and Sermo as they were already decided in 2014 and these defendants have presented no new evidence or arguments to justify revisiting the earlier decision denying summary judgment. A second summary judgment motion is appropriate "when the moving party has expanded the factual record on which summary judgment is sought." *Lexicon, Inc. v. Safeco Ins. Co. of Am.*, 436 F.3d 662, 670 n. 6 (6th Cir. 2006). Accordingly, "the party renewing its motion is limited to issues relating to the new material," and "a party may not revisit the Court's finding with respect to issues decided in the first decision." *Morris v. Corr. Med. Servs*., 2010 WL 728996, at *1 (E.D. Mich. Feb. 24, 2010) (Tarnow, J.) (quoting *Wechsler v. Hunt Health Sys., Ltd*., 198 F. Supp. 2d 508, 514 (S.D.N.Y. 2002)) (alterations removed).

Plaintiff points out that Dahl, Beauvais, and Sermo promised the Court a renewed motion based on "evidence previously not available"—specifically

plaintiff's medical records.  (Dkt. 185, Pg ID 2725).  According to plaintiff, however, defendants did not deliver on that promise.  Indeed, plaintiff maintains that his medical records unquestionably were previously available to Dahl, Beauvais, and Sermo as they easily could have acquired them with a non-party subpoena.  Plaintiff also points out that Pozios acquired his medical records via subpoena as early as September 24, 2012, (Dkt. 112-26, Pg ID 1429-30), and Dahl, Beauvais, and Sermo would necessarily have been aware of the subpoena. Fed.R.Civ.P. 45(a)(4).  They could have acquired copies from Pozios. Fed.R.Civ.P. 34.  Further, Pozios repeatedly filed extensive portions of plaintiff's medical records in support of his own motions.  (*See e.g.*, Exhibits to Aug. 8, 2013 Summary Judgment Motion, Dkt. 66-1, Pg ID 692, 718-60; Exhibits to Jan. 1, 2014 Summary Judgment Motion, Dkt. 112-1, Pg ID 1320, 1343-85, 1424-27). Yet, Dahl, Beauvais, and Sermo point to some of the exact same records as if they are newly discovered evidence.  Accordingly, plaintiff asserts that documents that were in the Court's record as of August 8, 2013 were not unavailable when Dahl, Beauvais, and Sermo filed their first summary judgment motion on January 8, 2014, (Dkt. 110, Pg ID 1247), or when the District Court finally resolved the motion on November 12, 2014, (Dkt. 138, Pg ID 1948).  Moreover, plaintiff points out that Dahl, Beauvais, and Sermo rely solely on the medical records for support of the present motion and do not discuss any of the new evidence – interrogatory

responses, deposition testimony, etc. – or suggest that it provides a basis for the Court to revisit the prior summary judgment ruling.  (Dkt. 193, Pg ID 3345-72).

Additionally, plaintiff contends that the Court necessarily found that the facts alleged or shown by plaintiff establish the violation of constitutional rights by Dahl, Beauvais, and Sermo, when it rejected the qualified immunity argument. Therefore, the rights at issue were clearly established as of 2012.  *See Stoudemire*, 705 F.3d at 567.  Dahl, Beauvais, and Sermo assert qualified immunity again, but they fail to offer any evidence that was not available during the previous round of summary judgment briefing.  Thus, plaintiff maintains that there is no basis to revisit the first prong of the qualified immunity test.  Similarly, Dahl, Beauvais, and Sermo do not offer any intervening case law that changes whether the conduct at issue clearly violated plaintiff's constitutional rights.  (Dkt. 193, Pg ID 3356-72).

In response, Dahl asserts that the Court previously indicated that it lacked the necessary evidence (medical records) showing the course of treatment in the RTP that the plaintiff received.  (Dkt. 138, Pg ID 1958).  According to Dahl, that evidence was obtained through discovery in the fall of 2015 and has now been presented to the Court.  Sermo and Beauvais argue that the Court previously denied summary judgment because "Plaintiff was in the throes of a weeks-long period of mental instability and neurological distress."  (Dkt. 138, Pg ID 1959).

According to defendants, the records now show that Beauvais was not involved, that the plaintiff was regularly followed by both healthcare and mental-health staff and plaintiff was not ignored or treated with indifference.  Rather, he was closely followed.  When he was on "hunger strike," healthcare staff monitored him.  The records also clearly show that the plaintiff was stable (eating, drinking, taking medications) in the days leading up to his "suicide" attempt.  Defendants contend that transfer to a CSP would have been improper – the prior reliance on the Lang affidavit should be discounted because of this.  (Dkt. 138, Pg ID 1960).[1]

While plaintiff makes a fair point, the Court believes that the better course of action is to address all of the pending motions on the merits.  There are cases permitting defendants in civil rights cases to move for summary judgment twice on the issue of immunity.  Once, before discovery (usually this is postured as a motion to dismiss, not a motion for summary judgment) and second, after discovery.  *See e.g.*, *Kennedy v. City of Cleveland*, 797 F.2d 297, 299-300 (6th Cir. 1986); *Devlin v. Kalm*, 2015 WL 6994355, at *1 (6th Cir. 2015).  While this case involves two motions for summary judgment, there is still the pre/post discovery dichotomy.  In the view of the undersigned, given that after the initial motions for summary judgment were addressed, the case was sent back for discovery, a

---

[1]  Plaintiff makes a similar argument regarding Pozios' second motion for summary judgment, suggesting that there is no new evidence and the Court should not revisit issues previously decided, particularly with respect to the Lang affidavit.  Pozios asserted similar arguments in response as the other defendants.

scheduling order was issued and a new dispositive motion deadline set, these

motions should be addressed on the merits.

C.   <u>Defendant Dahl</u>

There are cross-motions for summary judgment pending between plaintiff

and defendant Dahl, against whom plaintiff asserts a First Amendment retaliation

claim.  A prisoner retains First Amendment rights that are not inconsistent with his

status as a prisoner or with the legitimate penological objectives of the corrections

system.  *See Pell v. Procunier*, 417 U.S. 817, 822 (1974).  Retaliation based on a

prisoner's exercise of his or her constitutional rights violates the Constitution.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).  To establish a First

Amendment retaliation claim, the plaintiff must prove that: (1) the plaintiff

engaged in activities protected by the Constitution or statute; (2) the defendant

took an adverse action that would deter a person of ordinary firmness from

continuing to engage in that conduct; and (3) that this adverse action was taken at

least in part because of the exercise of the protected conduct.  *Id*.  "[I]f a prisoner

violates a legitimate prison regulation, he is not engaged in 'protected conduct,'

and cannot proceed beyond step one." *Id*. at 395.  Further, the plaintiff must be

able to prove that the exercise of the protected right was a substantial or

motivating factor in the defendant's alleged retaliatory conduct.  *See Mount*

*Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  If the

plaintiff is able to make such a showing, the burden shifts to the defendant to show
that the same action would have been taken even absent the plaintiff's protected
conduct. *Id.*; *Thaddeus-X*, 175 F.3d at 399.

As touched on above, Judge Tarnow preliminarily determined that plaintiff
established a *prima facie* case of retaliation. Dahl only argued in her first motion
for summary judgment that plaintiff could not establish causation. Judge Tarnow
rejected that argument, but also concluded, as Dahl points out, that he could not
conduct a "totality of the circumstances" test for the causation prong because the
record was incomplete at that point. Dahl did not "concede" the other two prongs
of the retaliation standard; rather, she declined to contest them in the first motion,
putting all her eggs in the causation basket. Thus, in the view of the undersigned,
she is not precluded from arguing that plaintiff cannot establish a First
Amendment retaliation claim on all the prongs at this juncture of the proceedings.

1.      Protected Conduct

There is no question that the filing of a grievance challenging the conditions
of confinement is protected First Amendment conduct. *Noble v. Schmitt*, 87 F.3d
157, 162 (6th Cir. 1996). Similarly, a prisoner assisting fellow inmates with
drafting grievances when those inmates are otherwise unable to do so themselves
is also engaged in protected activity. *Thaddeus-X*, 175 F.3d at 395-96; *see also*
*Gibbs v. Hopkins*, 10 F.3d 373, 378-79 (6th Cir. 1993). The parties sharply

disagree about whether plaintiff has sufficiently identified any protected conduct in this case.  Dahl contends that all Warden's Forum-related activity is not protected conduct.  Plaintiff maintains that just because his protected conduct related to his position as a Warden's Forum representative, that does not negate its status as protected conduct.

According to plaintiff, he engaged in no fewer than three distinct types of protected activity during his time as Housing Unit Representative.  First, he assisted fellow inmates Mr. Plocha and Mr. Puckett with drafting grievances because these inmates were functionally illiterate and would not have been able to seek redress but for his assistance.  (Dkt. 183-2 at ¶¶ 31-34, Dkt. 183-8, 189-9).  It is further undisputed that during his time as Housing Unit Representative, prison officials directed other prisoners to plaintiff for help drafting grievances.  *Id*. at ¶ 30; Ex. E at 146.  Thus, plaintiff says his assistance to Mr. Plocha and Mr. Puckett constituted protected activity under the First Amendment.  *King v. Zamiara*, 150 Fed. Appx. 485, 493 (6th Cir. 2005)

Second, plaintiff asserts that his other actions as Housing Unit Representative also enabled prisoners to "challenge the conditions of their confinement" and thus constituted protected activity under the First Amendment. *Lewis*, 518 U.S. at 355.  As Housing Unit Representative, plaintiff's responsibilities included conducting daily rounds of the RTP to speak with fellow

inmates who had been directed by MDOC officials to convey their concerns about RTP conditions to him as Housing Unit Representative for compilation and submission.  (Dkt. 183-2, at ¶¶ 27-28).  Standing alone, that, as well as the submission of the resulting Agenda, constituted protected First Amendment activity according to plaintiff.  *King*, 150 Fed. Appx. at 492.

Third, plaintiff asserts that his actions as Housing Unit Representative in compiling and drafting the Agenda constituted protected activity because a central concern in the Agenda submitted to RTP Unit Chief Defendant Dahl was that certain RTP residents were being denied access to the materials in the law library. (Dkt. 183-10).  According to plaintiff, it is well-established that a lack of adequate research materials deprives an inmate of the constitutional right to access the courts.  *Bounds v. Smith*, 430 U.S. 817, 828 (1977) ("We hold, therefore, that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.").  Because RTP prisoners were not being afforded adequate access to law library materials, and because those same RTP prisoners were directed to voice their concerns to plaintiff as the Housing Unit Representative, plaintiff's submission of the Agenda challenging the lack of law library access was protected First Amendment activity since it was necessary to

17

ensure the access of RTP inmates to the Courts.  *Cf. Thaddeus-X*, 175 F.3d at 395

(Even "the existence of a prison law library, standing alone, does not necessarily

suffice to ensure uneducated or non-English speaking inmates a reasonably

adequate opportunity to file nonfrivolous legal claims challenging their

convictions or conditions of confinement.").

Dahl counters that plaintiff's complaint only pleads a claim of

Warden's Forum participation as protected conduct.  She says that this is not

protected conduct and, even if it were, it was not clearly established at the time of

the events in question.  In his motion, plaintiff now claims to have helped two

prisoners file grievances.  He also claims he helped other unspecified prisoners file

grievances.  However, Dahl asserts that plaintiff did not plead this claim, and

claims she never knew that the plaintiff helped other prisoners with grievances.

(Dkt. 199-5, Affidavit of Debra Dahl, ¶ 5).  During discovery, plaintiff's counsel

obtained a copy of all grievances filed by RTP prisoners for the relevant

timeframe.  Of those, the plaintiff identified only two to whom he provided help.

As to those two specific grievances, the plaintiff claims that the grievants were

illiterate.  According to Dahl, this is not true because both grievant prisoners had

high-school diploma equivalencies.  (Dkt. 199-2).  Additionally, Puckett testified

that the Resident Unit Manager for the unit was available to assist prisoners in

writing grievances – Puckett got such help on another occasion.  (Dkt. 199-3,

Affidavit of Timothy Puckett, ¶ 4).  According to Dahl, there is no law holding

that helping another prisoner with a grievance is protected conduct.

Notably, there are no published decisions in the Sixth Circuit squarely

addressing whether Warden's Forum activities can constitute protected conduct.

Yet, as explained below, the court does not need such a specific case in order find

that plaintiff engaged in protected conduct.  In 2005, the Sixth Circuit held that an

inmate engaged in First Amendment protected activity when he performed his

duties as an elected "representative of his housing unit."  *King*, 150 Fed. Appx. at

492-93.  The Sixth Circuit reasoned:

> King was elected to the Warden's Forum as a
> representative of his housing unit pursuant to MDOC
> policy 04.01.150. According to that policy, King was the
> person that prisoners in his unit should contact about
> "concerns that have not been resolved at the unit level."
> King was not a jailhouse lawyer merely "hanging a
> shingle" with hopes of attracting business; he was the
> appointed representative to whom the officials told other
> inmates to turn for the resolution of grievances.

*Id*. at 492.  The Sixth Circuit also held that Mr. King's assistance of functionally

illiterate prisoners with grievances constituted protected activity under the First

Amendment.  *Id*. at 493.  In published decisions, the Sixth Circuit has held that

"[i]t is clear in this circuit that an inmate does not have an independent right to

help other prisoners with their legal claims."  *Thaddeus–X v. Blatter*, 175 F.3d

378, 395 (6th Cir. 1999) (*en banc*) (citing *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th

Cir. 1993)). For this reason, in other unpublished decisions, the Sixth Circuit and lower courts in Michigan have generally determined, without much analysis, that participation in the Warden's Forum is not protected conduct. *See e.g.*, *Griffin v. Berghuis*, 2016 WL 1165826, at *2 (6th Cir. 2016); *Moore v. Mich. Dep't of Corr.*, 2009 WL 2170369, *3 (W.D. Mich. 2009) (citing *Cromer v. Dominguez*, 103 Fed. Appx. 570, 573 (6th Cir. 2004)); *Davis v. Straub*, 2009 WL 4908433, *9 (W.D. Mich. 2009); *Reeves v. Chapman*, 2011 WL 2518843 (E.D. Mich. 2011) ("A prisoner is not engaged in protected First Amendment activity when appearing as a representative to a warden's forum to present issues on behalf of other inmates.").

A recent decision from the Western District attempts to square the *Cromer* line of cases with *King v. Zamiara. See Cross v. Cook*, 2015 WL 7731447 (W.D. Mich. 2015), *report and recommendation adopted*, 2015 WL 7738091 (W.D. Mich. 2015). In *Cross*, the court first looked at the primary holding in *Cromer*, where the Sixth Circuit stated:

> The record fails to establish [a retaliation] claim because Cromer has not established that he was engaging in protected First Amendment activity as a warden's forum representative. Cromer has no liberty or property interest in his position as a unit representative on the warden's forum. *See Hewitt v. Helms*, 459 U.S. 460, 471, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). **Furthermore, Cromer has no First Amendment right to represent other inmates in presenting their grievances absent a**

20

> **showing that "the inmate [s] receiving the assistance**
> **would otherwise be unable to pursue legal redress**."
> *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000).
> Cromer has not demonstrated that the inmates he
> represented on the warden's forum could not have been
> represented by another inmate, or that they could not
> bring any concerns they may have to the attention of
> prison officials without Cromer's assistance. Even if
> Cromer was engaged in protected conduct when he
> advised and assisted other prisoners in his capacity as
> unit representative the complained of "adverse actions"
> were de minimis impositions which would not deter a
> person of ordinary firmness from continuing to serve as a
> unit representative.

*Id*. at 573 (emphasis added).  The *Cross* court contrasted *Cromer* with the

protected conduct in *King v. Zamiara*, where the Sixth Circuit concluded that

"since prisoners were required to lodge complaints with King as a prerequisite to

access the courts and since King has presented uncontested affidavits stating that

his help was necessary, he has presented sufficient evidence that his legal

assistance to others constitutes protected conduct."  *Id*. at 493.  In *Cross*, the court

concluded that *King* did not apply because it did not involve a situation (which

also included the confidentiality of prisoner files) where the plaintiff, as Unit

Representative, was assisting other prisoners with their constitutional right to

access the courts.  In addition, the court concluded that the plaintiff was not

protecting his own access to the courts by raising the issue of file confidentiality.

*Id*.

In the instant case, plaintiff has presented evidence that he helped other prisoners with grievances and that they needed his help, while Dahl counters with evidence that other help was available for prisoners to write grievances. The question is whether and to what extent plaintiff must establish that he was the *only* avenue for grievance assistance, even at a particular time. And, does plaintiff's "opinion" that the two grievants he identified would not have been able to pursue their grievances without his help (one of which seems to deny this) create a question of fact? While there is nothing to rebut plaintiff's claim that he was "tasked" with gathering complaints as the RTP unit representative, there does not seem to be any evidence suggesting, as in *King*, that his assistance was *required* before prisoners were permitted to access the courts. In *King*, it was clear that the correctional facility had set up a system that required going to King first.

Plaintiff here states that he was "tasked" with gathering complaints, and that the complaint regarding access to the law library implicates access to the courts. In contrast to the present matter, the plaintiff in *King* offered affidavits from the grievants he assisted indicating that they had no other way to file grievances except with his assistance. Plaintiff does not offer any such affidavits. The undersigned is not convinced, however, that either party has established the absence of a question of material fact on the issue of protected conduct as to plaintiff's assistance with grievances.

Yet, irrespective of the grievance assistance issue, the undersigned concludes that the Agenda submitted by plaintiff constitutes protected conduct. Consequently, plaintiff has made a *prima facie* showing on this prong of the First Amendment retaliation claim. As explained in *Horn v. Hunt*, 2015 WL 5873290, at *6 (S.D. Ohio Oct. 8, 2015), *report and recommendation adopted*, 2015 WL 8489387 (S.D. Ohio Dec. 11, 2015), prisoners retain a general First Amendment right to criticize prison officials. Moreover, in *Horn*, the court also acknowledged that there is support in the Sixth Circuit that even verbal complaints by a prisoner may, under certain circumstances, constitute protected conduct. *Id*. (citing *McCaskill v. Dettloff*, 2012 WL 4177034, *3 (E.D. Mich. July 13, 2012) (citing *Davis v. Straub*, 2009 WL 4908433 (W.D. Mich. Dec. 11, 2009)); *see also King v. Ditter*, 432 F.Supp.2d 813, 818-19 (W.D. Wis. May 30, 2006). As the Court of Appeals explained in *Clark v. Johnson*, 413 Fed. Appx. 804, 813 (6th Cir. 2011), the grievance does not necessarily have to be formal to be protected; rather, the issue is whether the grievance, regardless of form, is frivolous. *Id*. ("The problem ... is not that [the] complaint was informally made, but that it has not been shown to have had any merit"). Indeed, the *Horn* decision reminds us that our Court of Appeals and "[t]he Supreme Court ha[ve] made it clear that prison inmates retain all First Amendment rights not incompatible with their status as prisoners, 'or with the legitimate penological objectives of the corrections system.'" *Jones v. Caruso*,

23

569 F.3d 258, 267 (6th Cir. 2009) (quoting *Pell v. Procunier*, 417 U.S. 817, 832

(1974)).  "Consequently, courts have recognized that an inmate's exercise of First

Amendment rights is not limited solely to filing grievances or accessing the

courts."  *Horn*, at *5.

The undersigned takes from these cases that the mere form of the grievance

or complaint, by itself, is not sufficient to determine whether the conduct is

protected.  Rather, the substance of the grievance is also part of the consideration.

*Treadwell v. Almy*, 2013 WL 6668680, *7 (W.D. Mich. 2013) ("A reasonable,

well-trained prison administrative official would not be on notice of plaintiff's

clearly established First Amendment rights to air informal, uneducated

speculations regarding food quality."); *Robison v. Coey*, 2015 WL 5437175, *7

(S.D. Ohio 2015), *report and recommendation adopted*, 2015 WL 6164113 (S.D.

Ohio 2015) ("An inmate's questions to his supervisor regarding his participation

in an activity he believed to be prohibited seems reasonably to fall within the[]

parameters [of protected speech under the First Amendment].").  Here, the Agenda

contains complaints that affect plaintiff personally, along with other inmates in his

unit.

Plaintiff's assertion that his position on the Warden's Forum should not

automatically render the Agenda outside the scope of protected conduct is well-

taken.  The cases holding that participation in the Warden's Forum is not protected

conduct are readily distinguishable from the present case.  For example, in *Cromer v. Dominguez*, the conduct at issue (thought not described in the Sixth Circuit opinion) was described at the District Court level as "advice and assistance [plaintiff] gave to other prisoners in his position as warden's forum representative."  (E.D. Mich. Case No. 01-10187, Dkt. 52, Pg ID 96).  In the report and recommendation (adopted in relevant part by District Judge David M. Lawson), Magistrate Judge Binder observed that the plaintiff had not demonstrated that the other inmates could not have brought their concerns forward without plaintiff's assistance and therefore, under *VanDiver*, the plaintiff was not engaged in protected conduct.  *Id*.  Here, however, plaintiff does not merely rely on vague claims of providing assistance to other prisoners.  Rather, he brought forth written complaints on his own behalf, as well as those of other prisoners in his unit.  For this reason, *Cromer* and *VanDiver* are distinguishable.

*Miller v. Berghuis*, 2014 WL 1909348 (W.D. Mich. 2014) is similarly distinguishable because the only conduct at issue was the plaintiff's bringing issues to the attention of the Warden's Forum.  The court concluded that the plaintiff's efforts were not necessary in order to protect the rights of other prisoners to access the courts.  *Id*. at *4.  Again, there was no issue in *Miller* of the plaintiff trying to complain on his own behalf to the Warden's Forum.  The same is true in *Reeves v. Chapman*, where the Court only dismissed the retaliation claim

25

to the extent the plaintiff was raising issues on behalf of other prisoners in the context of the Warden's Forum.  And, in *Moore v. Mich. Dep't of Corr.*, 2009 WL 2170369, *3 (W.D. Mich. 2009), the court merely concluded that plaintiff's raising an unspecified issue at the Warden's Forum was not protected conduct.

The undersigned also finds the present circumstances distinguishable from those in *Griffin v. Berghuis*, 563 Fed. Appx. 411, 415 (6th Cir. 2014),[2] where the Sixth Circuit concluded that a letter prepared by the plaintiff and sent to the warden and other Warden's Forum members was not protected conduct because it was circulated to other inmates and deemed a prohibited inter-inmate communication.  As noted by the Court of Appeals, regardless of whether the plaintiff's First Amendment claim was brought under the Free Speech clause or the Petition Clause, the same legal test applies: "his letter is unprotected if its

---

[2] *Griffin* also points out that the Warden's Forum members are not permitted to use the Forum as a substitute for the grievance process and that such a prohibition does not violate a prisoner's constitutional right to seek redress because a prisoner's constitutional right to assert grievances typically is not violated when prison officials prohibit only "one of several ways in which inmates may voice their complaints to, and seek relief, from prison officials" while leaving a formal grievance procedure intact.  *Id.* at 415-16 (quoting *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 130 n. 6 (1977)).  Here, however, there is no issue of any corrections official precluding plaintiff from submitting the Agenda based on either the notion that it violated a legitimate prison regulation or that plaintiff was required to bring a grievance to resolve the issues contained in the Agenda.  Indeed, plaintiff appears to have been following the MDOC policy directive governing the Warden's Forum and there is no suggestion from Dahl that he violated that policy.  Simply because the Warden's Forum cannot be used as a *substitute* for the grievance process (which quite likely pertains to exhaustion of administrative remedies) does not suggest to the undersigned that any and all activities associated with the Warden's Forum lose any First Amendment protections.  Moreover, the Court of Appeals in *Griffin* simply did not decide (finding it "unclear") whether the letter was covered by the Petition Clause or was otherwise protected by the First Amendment.  *Id.* at 416.  Thus, the undersigned finds nothing in *Griffin* that undermines the principles set forth in *Horn* and *Clark*, *supra*.

prohibition by prison officials is 'reasonably related to legitimate penological interests.'" *Id*. (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *see also Thaddeus-X*, 175 F.3d at 395 ("[I]f a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct.'" (internal citation omitted)). Dahl raises no such issues in this case about plaintiff's Agenda.

Finally, while Dahl claims that she is entitled to qualified immunity because there is no clearly established law holding that participation in the Warden's Forum is protected conduct, in the view of the undersigned, plaintiff's submission of the Agenda to Dahl and other prison officials was protected conduct and plaintiff's right to engage in such protected conduct is clearly established. In this circuit, a district court may look to the Supreme Court, the Sixth Circuit and its own decisions in determining whether a right is clearly established:

> Our review of the Supreme Court's decisions and of our own precedent leads us to conclude that, in the ordinary instance, to find a clearly established constitutional right, ***a district court must find binding precedent by the Supreme Court, its court of appeals or itself***. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law. For the decisions of other courts to provide such "clearly established law," these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting. Here a mere handful of decisions of other circuit and district courts, which are admittedly novel,

cannot form the basis for a clearly established
constitutional right in this circuit.

*Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177-78 (6th Cir.

1988) (emphasis added). As the Sixth Circuit recently explained, when

determining whether a right is clearly established, the question is whether the state

official had "fair warning" that his or her actions were unconstitutional:

> A right is clearly established when its contours are
> sufficiently clear that a reasonable official would
> understand that his conduct violates that right. *Wheeler
> v. City of Lansing*, 660 F.3d 931, 938 (6th Cir. 2011)
> (quoting *Anderson v. Creighton*, 438 U.S. 635, 640
> (1987)). A right may be clearly established "even if there
> is no case involving 'fundamentally similar' or
> 'materially similar' facts." *Burchett*, 310 F.3d at 945
> (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).
> Rather, the question is whether Lyons had "fair warning"
> that his actions were unconstitutional. *Hope*, 536 U.S. at
> 741. The Supreme Court has clarified that the
> "dispositive question is whether the violative nature of
> particular conduct is clearly established," examined "in
> light of the specific context of the case, not as a broad
> general proposition." *Mullenix v. Luna*, 136 S. Ct. 305,
> 308 (2015).

*Scott v. Kent Cty.*, No. 16-1587, 2017 WL 655773, at *4 (6th Cir. Feb. 17, 2017)

Generally, "[t]he Supreme Court has made it clear that prison inmates retain

all First Amendment rights not incompatible with their status as prisoners, 'or with

the legitimate penological objectives of the corrections system.'" *Jones v. Caruso*,

569 F.3d 258, 267 (6th Cir. 2009) (quoting *Pell v. Procunier*, 417 U.S. 817, 832

(1974)). And specifically, a prisoner's right to informally grieve issues of his or

her own ill treatment has been deemed protected by the First Amendment in this Circuit and in this District. *Clark v. Johnson*, 413 Fed.Appx. 804, 813 (6th Cir. 2011) ("The problem ... is not that [the] complaint was informally made, but that it has not been shown to have had any merit"); *Davis v. Straub*, 2009 WL 4908433 at *3 (The prisoner-plaintiff's letter contains language that is protected speech as well as language that is not protected because it violates prison regulations.); *Carter v. Dolce*, 647 F.Supp.2d at 834 ("[W]hen it comes to protecting First Amendment rights, including the right to petition the government for redress, there is little difference between retaliating against a person for filing a grievance, and retaliating for threatening to file one. The right to file a grievance stems from the First Amendment right to free speech and to petition the state for redress of grievances. Once a prisoner makes clear his intention to resort to official channels to seek a remedy for ill treatment by a prison employee, retaliation against the prisoner by that employee implicates all the policies intended to protect the exercise of a constitutional right.") (internal citation omitted); *Riley v. Kurtz*, 893 F.Supp. 709, 720 (E.D. Mich. 1995) ("Accepting as true Riley's allegations that he filed, or threatened to file, complaints against Kurtz with appropriate government bodies, *e.g.*, the prison administration or the courts, Riley clearly engaged in activity that is protected by the First Amendment."). It is clearly established that a prisoner's informal grievances or threats to file grievances, including via letter or

verbally, where not frivolous, are protected conduct.

The contours of this right were sufficiently clear when plaintiff submitted the Agenda to Dahl, given that numerous courts in this District and this Circuit have concluded that complaints of ill treatment need not necessarily be raised solely in the grievance process in order to be considered protected conduct. Based on the foregoing authority, plaintiff's right to complain about ill treatment by a prison employee, as exercised here through the submission of the Agenda to various prison officials, including Dahl, is protected conduct. Thus, Dahl is not entitled to qualified immunity and plaintiff has established this prong of his *prima facie* case of retaliation.

2.    Adverse Action

Dahl discharged plaintiff four days after he submitted the comprehensive Agenda detailing multiple alleged deficiencies of RTP conditions under MDOC policy. Plaintiff asserts that it is well-established that a transfer of a prisoner to a unit with less privileges and worse conditions constitutes an "adverse action." *See e.g.*, *Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010) ("actions that result in more restrictions and fewer privileges for prisoners are considered adverse."). It is undisputed that general population has far fewer privileges and programs than the inpatient RTP program. The RTP offered prisoners art therapy, music therapy, weight pit therapy and group therapy. (Dkt. 183, Ex. E at 158). None of these

were offered in the general population setting to which plaintiff was transferred.

(Dkt. 183-2, at ¶ 20). Plaintiff contends there is no genuine issue of material fact

that his transfer from RTP to the general population was an action that "resulted in

more restrictions and fewer privileges" for him and therefore constituted an

"adverse action" for purpose of a retaliation claim.

Dahl takes a different view. In the pre-discovery motion practice, the Court

was under the impression that Dahl had changed the plaintiff's diagnoses when he

was discharged from the RTP. (Dkt. 138, Page ID 1958). Dahl says she has

proved that to be completely false – she has submitted the medical records

showing that she did not change the plaintiff's diagnoses. (Dkt. 194, bates

3190-3341). Dahl says her action was limited to recording the change in GAF and

documenting the reasons why plaintiff was ready for discharge from the RTP.

Contrary to the plaintiff's assertion that the records are "empty" as to the reason

for the discharge, Dahl insists that she recorded the change in the plaintiff's GAF

score and did indicate the reason he was ready to be discharged to the next level of

care – out-patient mental health. (Dkt. 183, Ex. L). Additionally, the records

leading up to that decision demonstrate a clear pattern of improving behavior on

the plaintiff's part. Based on these records, Dahl says that plaintiff's discharge

was clearly appropriate. According to Dahl, plaintiff was moved from more

intensive mental-health services to an out-patient program which is a positive

development, not an adverse action.  Dahl insists that plaintiff can point to no

clearly established law holding that his discharge from the RTP was an adverse

action.  Thus, plaintiff was treated appropriately, and that treatment does not

qualify as an adverse action under clearly established law.  As a result she says she

is entitled to qualified immunity.

In the view of the undersigned, plaintiff has the better argument.  Dahl's

argument focuses on the incorrect prong of the standard.  She argues that the

discharge was based on plaintiff's improvement, which is really either a causation

argument (the discharge was not the result of the protected conduct, but rather,

was based on plaintiff's improvement) or an attempt to show that the action of

discharge would have been taken regardless of the protected conduct (the

discharge was supported by the medical evidence and therefore would have

occurred anyway).  In *Hill v. Lappin*, the Court concluded that "actions that result

in more restrictions and fewer privileges for prisoners are considered adverse."

630 F.3d at 474.  As plaintiff points out, even Dahl's partially-stricken

post-discovery affidavit conceded that "the support groups available in RTP I do

not believe were available in OPT."  (Dkt. 199-5, Page ID 3791).  Thus, under *Hill

v. Lappin*, the discharge from RTP plainly constitutes an adverse action.

    3.    Causation

Plaintiff argues that there is no genuine issue of material fact that his

discharge from the inpatient RTP program to the general prison population was
motivated at least in part by his protected First Amendment activity. "A causal
link can be shown through direct or circumstantial evidence, including showing
temporal proximity between engaging in protected activity and suffering an
adverse [] action that may create an inference of causation." *Eckerman v.
Tennessee Dept. of Safety*, 636 F.3d 202, 209 (6th Cir. 2010). According to
plaintiff, it is undisputed that on March 20th, the day after he submitted the Plocha
grievance and the Agenda to Dahl and other RTP officials raising prisoner
complaints about RTP conditions, RTP officials "refused" to allow plaintiff out of
his cell to conduct his daily rounds even though the other RTP Housing Unit
Representative was permitted to conduct his rounds. (Dkt. 183-2, ¶¶ 38-40; Ex. E
at 153-54). In fact, plaintiff was prevented from conducting his daily rounds every
day until his expulsion from RTP by Dahl on March 23. *Id*. Plaintiff was not
under any disciplinary sanction at the time, nor was he provided a reason why he
was not allowed out of his cell to conduct his rounds as he had been each day
prior. (Dkt. 183-2, at ¶¶ 38-40).

According to plaintiff, Dahl has attempted to defend her unconstitutional
actions by asserting that the change in his GAF score was the result of a "case
management meeting" which allegedly took place on March 21, 2012. (Dkt. 183,
Ex. M). Yet, plaintiff never attended such a meeting, nor was he invited to or

informed of one.  (Dkt. 183-2, at ¶ 41; Ex. E at 155-56).  Plaintiff testified that as

of March 2012, he had not discussed his mental health with his psychiatrist or any

other mental health professional in months.  *Id*.  Indeed, between October of 2011

and his expulsion from RTP, plaintiff claims no health care professional asked him

whether he was still having suicidal or homicidal thoughts, the reason for his

placement in RTP.  *Id*.; Ex. E at 156.  Plaintiff maintains that there is no

admissible evidence to support the assertion that a "case management meeting"

occurred on March 21st.  Plaintiff's medical records do not contain a single

mention of any "case management meeting" on or around March 21, 2012.  To be

sure, notations are made in the medical record when case management meetings

are held.  Plaintiff's medical records contain multiple such entries.  (Dkt. 183, Ex.

N).  However, no such entry is present for March 21, 2012.  Dr. Karen Noelle

Clark, a licensed psychologist, reviewed plaintiff's medical records and found an

absence of documents supporting the GAF change.  She writes, "Mr. Berkshire's

GAF was 48 at the time of his written complaint toward staff; three days later he

scored 53.  There is no mention of a supporting assessment completed" (Dkt. 183,

Ex. C at 6) and "[t]here was no written substantiation in his record that accounted

for the five point differential."  *Id*. at 10.

Dahl testified that she was aware that the rule that GAF scores above 50

rendered a prisoner ineligible for RTP was "absolute."  (Dkt. 183, Ex. F at 69).

34

Plaintiff points out that Dahl was the gatekeeper of RTP, given her testimony that she "reviewed every GAF score before a patient was transferred out of RTP." *Id*. Indeed, Dahl signed the only document in plaintiff's medical record indicating that his GAF score had increased to the point where he would be automatically expelled to the general population. (Dkt. 183, Ex. L). And it was Dahl who, plaintiff alleges, received the Agenda he submitted on March 19, 2012, detailing the deficiencies in the conditions at RTP -- conditions for which Dahl, as the RTP Unit Chief, was ultimately responsible. (Dkt. 183, Ex. A at ¶¶ 35-36; Ex. I). When asked about the alleged "case management meeting" during her deposition, Dahl admitted that she has no memory of any such meeting happening. (Dkt. 183, Ex. F at 65). She also testified that she has no recollection of "any of the events of March 19th through 21st, 2012." *Id*. Dahl said during discovery that even though she has no recollection of her alleged case management meeting (Dkt. 183, Ex. F at 65), and she cannot remember anything about plaintiff other than that he "complained" to her a lot (*Id*. at 74), documents in his medical record would vindicate her position that a meeting occurred. (Dkt. 183, Ex. Q at 2). Plaintiff points out that he obtained from MDOC the full set of his medical records and there is no mention of a "case management meeting" in March 2012. As a result, he contends that the lack of any documentary evidence combined with Dahl's failed memory leaves her unable to offer testimony about the supposed meeting at

trial and therefore there is no admissible evidence that the alleged meeting ever took place.

Dahl begins her response with reference to the Court's rejection of the prior RR. As to causation, the Court held that since the parties had not "submitted evidence about Plaintiff's length of treatment or progress in the Residential Treatment Program, . . . it [was] impossible to conduct a totality-of-the circumstances analysis," and so a mere temporal link between the plaintiff's alleged forum activity and the discharge from RTP was sufficient to make a prima facie claim. (Dkt. 138, Pg ID 1957). The Court relied on the plaintiff's allegation that Dahl had removed "two major mental disorders that had been intractable for nearly Plaintiff's entire life." *Id*. Since that decision, Dahl contends that the allegation has been shown to be completely false. Dahl did not change the plaintiff's diagnoses from what they had been for many months. In addition, Dahl says she had no involvement in the Warden's Forum. She claims she was never provided the alleged the Agenda that the plaintiff claims to have given her. (Notably, this testimony from her affidavit was stricken and cannot be considered for purposes of summary judgment). Even if she had been provided the Agenda, the only link between that document and the discharge from RTP is a temporal one. The medical records, however, show that plaintiff's discharge was clearly due to his progress and would have been done even in the absence of any alleged

protected conduct.  Dahl points out that Plaintiff was admitted in July 2011 with a predicted discharge of January 2012.  In August 2011, after asking to be discharged, he was told that he needed to go three months without self-injurious behavior.  The plaintiff did that.  He was kept an extra two months beyond the original January target date – he was not discharged early or before meeting his goals.  Thus, according to Dahl, plaintiff clearly would have been discharged even in the absence of any protected conduct.  Therefore, under the clearly established law, Dahl maintains that she is entitled to qualified immunity.

In the view of the undersigned, plaintiff has made a *prima face* showing of the third prong of a retaliation claim.  Once plaintiff can show that his "exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct, the burden shifts to the defendant to show that the same action would have been taken even absent the protected conduct."  *Brown v. Crowley*, 212 F.3d 782, 787 (6th Cir. 2002); *see also Riley*, 893 F.Supp. at 720 (E.D. Mich. 1995) (plaintiff need only make *prima facie* showing to trigger burden-shift to defendant).  Plaintiff was elected as Housing Unit Representative in early March of 2012.  (Dkt. 183, Ex. A at ¶ 26).  He conducted daily rounds of fellow RTP residents, compiling concerns about RTP conditions for submission to the RTP Unit Chief, Defendant Dahl.  *Id*. at ¶ 27.  On March 19, he submitted an Agenda to Dahl, detailing six concerns the RTP residents had about conditions in RTP as

well as the specific MDOC policies those conditions violated.  (Dkt. 183, Ex. I).

The very next day, for the first time, RTP officials refused to allow plaintiff to

conduct his rounds.  (Dkt. 183, Ex. A at ¶ 38).  Within a day or two after that, Dahl

alleges that a meeting "would have taken place" wherein plaintiff's progress

would be discussed.  (Dkt. 183, Ex. M)  It was determined that plaintiff's GAF

score should be changed, a change that was coincidentally just big enough to

result in plaintiff's automatic expulsion from RTP and removal from his position

as Housing Unit Representative.  Yet, plaintiff was never informed of such a

meeting, never attended such a meeting, and had not been asked in months

preceding whether he was still having suicidal or homicidal thoughts, the reason

for his placement in RTP.  (Dkt. 138, Ex. E at 156).  Moreover, plaintiff's medical

records are void of any reference to Dahl's alleged meeting, despite consistent and

numerous entries and records for previous case management meetings.  (Dkt. 183,

Ex. N).  In the view of the undersigned, based on the foregoing evidence, plaintiff

has established a *prima facie* showing of retaliatory motive.

        The burden thus shifts to Dahl to show that she would have taken the same

actions towards plaintiff even absent the protected conduct.  Dahl cannot do so

because she testified that she remembers virtually nothing of plaintiff, any "case

management meeting," and does not remember any of the events between March

19, 2012 and March 21, 2012.  What she does remember of plaintiff is that he

visited her office "two to five times a week" and "probably every" visit involved

him "complaining about some aspect of his circumstances." (Dkt. 183, Ex. F at

74).  Because Dahl cannot offer testimony that she discharged plaintiff because he

was ready to be discharged and because she is stuck with "not remembering"

virtually anything about plaintiff, his discharge, and the reasons for changing his

GAF, the Court cannot reasonably conclude that plaintiff has failed to establish a

*prima facie* case as to causation.  Moreover, Dahl's rebuttal is not based on an

interpretation of medical evidence by someone qualified to offer such testimony.

Similarly, Dahl has no evidence showing that she would have taken the action

regardless of the protected conduct because she cannot actually remember what

happened, and the records did not refresh her recollection.  Thus, plaintiff has

established this prong of his *prima facie* case and Dahl has failed to rebut it.

Plaintiff is therefore entitled to summary judgment on his First Amendment

retaliation claim.

### D.   Defendant Nelson

Plaintiff's claim against Nelson is for deliberate indifference, in violation of

the Eighth Amendment.  (Dkt. 101, ¶ 30, Page ID 1197).  The claim is based on

the allegation that, on one occasion, Nelson would not let the plaintiff use the

bathroom.  *Id*. at ¶ 17.  Plaintiff alleges that he was not allowed to use the

bathroom while on top-of-bed restraints.  Nelson maintains that under clearly

established law, the denial of a single restroom break is not a constitutional violation and he is entitled to qualified immunity. In another case involving top-of-bed restraints, with facts similar to this case, the Sixth Circuit affirmed the district court's grant of dismissal on the basis that it had "previously held that deprivations of fresh water and access to the toilet for a 20-hour period, while harsh, were not cruel and unusual punishment." *Hartsfield v. Vidor*, 199 F.3d 305, 310 (6th Cir. 1999).

Furthermore, Nelson says that his potential liability must be assessed in light of his limited involvement in this case. "Each defendant's liability must be assessed individually, based on his or her own actions." *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir. 2008). In light of the documented evidence by a neutral third party, the nurse, plaintiff was in fact offered a restroom break, Nelson maintains that no reasonable jury could conclude that he was denied such. Even if the facts are viewed completely in the plaintiff's favor – i.e., that Nelson denied a bathroom break on one occasion – Nelson says his actions were not clearly unlawful under the established law and he is entitled to qualified immunity.

Plaintiff, on the other hand, asserts that Nelson violated clearly established law by denying him access to a toilet for no penological purpose. Nelson's argument is flawed, according to plaintiff, because he ignores *Barker v. Goodrich*, 649 F.3d 428 (6th Cir. 2011). Barker was another conditions-of-confinement case

40

involving restraints and the denial of bathroom access.  *See id.* at 434.  There, the court explained that "there is a substantial risk of serious harm in the denial of the minimal civilized measure of life's necessities."  *Id.* (citations omitted).  Accordingly, the court held it was a constitutional violation to deny "adequate access to water and a restroom" when there was "no legitimate penological purpose" for the deprivation.  *Id.* at 434-35 (citations omitted).  Barker also found the law to be clearly established:

> Defendants had fair warning in 2007 that their conduct was unconstitutional. Case law from the Supreme Court, [the Sixth Circuit], and other circuits established at that time that . . . denying access to the toilet [] could rise to an Eighth Amendment violation if allowed to persist for an extended period.

*Id.* at 435.  *Barker* was decided on August 10, 2011, eight months before Nelson's interaction with plaintiff.  Further, *Barker* explicitly approved of precedents finding that even short deprivations "violate the Constitution when they lack a penological purpose."  *Id.* at 436.  Thus, plaintiff maintains that "[t]he state of the law in [2012] gave [Defendant Nelson] fair warning that [his] alleged treatment of [Mr. Berkshire] was unconstitutional."  *Hope*, 536 U.S. at 741.

The starting point for the analysis of this claim can be found in Judge Tarnow's previous decision in this case regarding the denial of a bathroom break claim made against another defendant in this matter, who was granted summary judgment on this claim:

> Plaintiff's third objection goes to only his claim for
> deliberate indifference against Defendant LeDuc.
> Plaintiff alleges that LeDuc denied him an opportunity to
> use the restroom after one hour in top-of-bed restraints.
> The R & R [129] recommends that the Court conclude
> that LeDuc is entitled to summary judgment on the basis
> of qualified immunity because what he did is not clearly
> unlawful. Plaintiff objects that he should be given the
> opportunity to conduct discovery about whether LeDuc
> had a ministerial duty to offer more frequent bathroom
> breaks to Plaintiff. Even if LeDuc did have a
> policy-based obligation to offer Plaintiff more frequent
> breaks, breach of that duty would not rise to the level of
> clearly unlawful. *Robertson v. Lucas*, 753 F.3d 606, 621
> (6th Cir. 2014). Plaintiff's Objection [132] is overruled
> as to LeDuc.

*Berkshire v. Dahl*, 2014 WL 5847614, at *6 (E.D. Mich. 2014). The undersigned

acknowledges that neither the RR nor Judge Tarnow's decision discussed the

primary case now relied on by plaintiff, *Barker v. Goodrich*, 649 F.3d 428, 434

(6th Cir. 2011). In *Barker*, the Sixth Circuit concluded that the plaintiff's

constitutional rights had been violated based on the following recitation of facts,

accepted as true for purposes of the motion:

> While Barker was in the processing room, before he was
> placed in the observation cell, an officer asked to remove
> the cuffs; Barker asked to see mental health first because
> he was afraid of going into the cell. The officer waved
> off Barker's request for mental health services, and a
> short while later Barker was placed in the observation
> cell still handcuffed and wearing his original clothing.
> No officer, including the two responsible for the constant
> watch, asked or offered to remove the handcuffs again
> until the handcuffs were removed the next morning
> around 8:00 a.m.

> During the time he was in the cell and in handcuffs, he
> was not able to urinate or get a drink of water. His
> shoulders became stiff and he could not sit down or lie
> down comfortably, so he mostly stood up. Even at the
> time of his deposition, he had problems with his wrists,
> especially while writing letters.

*Barker v. Goodrich*, 649 F.3d 428, 431 (6th Cir. 2011) (internal citations and

quotations omitted).  After a review of these facts, the Court concluded as follows:

> The evidence viewed in the light most favorable to
> Barker establishes that there was no penological need to
> keep Barker handcuffed once he was placed in the
> detention cell, that Barker was nonresistant and did not
> refuse to have the handcuffs removed, and that Barker
> was handcuffed behind his back for twelve hours, during
> which time he missed a meal and was unable to sit or lie
> down without pain, use the restroom, or obtain water
> from the fountain. Thus, for no legitimate penological
> purpose, Barker was denied adequate access to water and
> a restroom, and forced to maintain an uncomfortable
> position for an extended period of time, subjecting him
> to a significant risk of wrist and arm problems,
> dehydration and thirst, and pain and damage to the
> bladder. This constitutes a denial of the minimal
> civilized measures of life's necessities.

*Barker v. Goodrich*, 649 F.3d 428, 434-35 (6th Cir. 2011) (citations omitted).  The

Court also concluded that the rights at issue were clearly established.

In the view of the undersigned, the facts in this case are distinguishable

from *Barker* and there was a legitimate penological purpose to restrain plaintiff

(he was suicidal), which was plainly absent in *Barker*.  Moreover, unlike the

circumstances in *Barker*, as to this particular defendant, there was a single request

and alleged denial of a bathroom break.  While plaintiff was restrained for several

hours, he does not allege that Nelson was monitoring him that entire time.  Rather,

his complaint is limited to a single occasion where he claims that Nelson denied

him a bathroom break.  Under applicable law, as cited by Nelson and previously

cited in the RR, such a denial does not rise to the level of cruel and unusual

punishment.  Thus, Nelson's motion for summary judgment should be granted.

E.   Defendant Pozios

The Supreme Court has recognized the responsibility of the courts "to

scrutinize claims of cruel and unusual confinement."  *Rhodes v. Chapman*, 452

U.S. 337, 352 (1981).  Included as a type of conduct that violates the Eighth

Amendment is a prison official's deliberate indifference to a prisoner's serious

medical needs.  *See e.g.*, *Estelle v. Gamble*, 429 U.S. 97 (1976); *Westlake v. Lucas*,

537 F.2d 857, 860 (6th Cir. 1976).  To succeed on a claim of deliberate

indifference, plaintiff must satisfy two elements, an objective one and a subjective

one.  He must show that (1) he had a serious medical need,  and (2) that

defendants, being aware of that need, acted with deliberate indifference to it.

*Wilson v. Seiter*, 501 U.S. 294, 300 (1991).

The second element of *Wilson* requires a showing that defendants acted with

deliberate indifference.  "Deliberate indifference" has been variously defined by

the federal courts that have considered prisoners' Eighth Amendment claims, but

all agree that it is more than mere negligence and less than actual intent in the form of a "malicious" or "sadistic" action. *Farmer v. Brennan*, 511 U.S. 825, 861 (1994); *see also Estelle*, 429 U.S. at 105-106 (a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim under the Eighth Amendment; "medical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995) (deliberate indifference is the equivalent of "criminal recklessness, which requires a subjective showing that the defendant was aware of the risk of harm"); *Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992) ("Obduracy or wantonness, not inadvertence or good faith error, characterizes deliberate indifference.").

As noted in *Estelle*, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. An allegation of mere negligence in diagnosis or treatment is not actionable under § 1983. *Estelle v. Gamble*, *supra*; *Byrd v. Wilson*, 701 F.2d at 595 n. 2. In *Whitley v. Albers*, 475 U.S. 312 (1986), the Court held that "[i]t is obduracy and wantonness, not inadvertence or error in good faith" that violates the Eighth Amendment in "supplying medical needs." "A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established." *McGuckin v. Smith*,

45

974 F.2d 1050, 1060 (9th Cir. 1992). The deliberate indifference standard

requires knowledge of the particular medical condition in order to establish an

intent ("a sufficiently culpable state of mind," *Wilson*, 501 U.S. at 298) to deny or

to delay purposely "access to medical care" or intentionally to interfere "with the

treatment once prescribed." *Estelle*, 429 U.S. at 104-05. Thus, "[k]nowledge of

the asserted serious needs or of circumstances clearly indicating the existence of

such needs, is essential to a finding of deliberate indifference." *Horn ex rel. Parks*

*v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir.), *cert. denied*, 513 U.S.

873 (1994).

> 1.     Subjective Prong of Deliberate Indifference Standard

Defendant Pozios concedes that under the objective component, plaintiff

appeared to have a serious medical need. Pozios maintains, however, that plaintiff

has not satisfied the subjective component. Dr. Pozios asserts that the only claim

against him can be found in paragraph 7 of the Second Amended Complaint,

which alleges:

> On March 30, 2012 it was noted in the Health Care Log
> Book and Defendant Pozios was informed that Plaintiff's
> psychotropic medications had expired. Defendant Pozios
> had deliberately refused to renew the order for those
> medications. The psychotropic medications prescribed to
> Plaintiff are used to help him rehabilitate his severe
> mental disorders, including but not limited to suicidal
> attempts.

(Dkt. 112, Ex. D). According to Pozios, contrary to the complaint and Lang's

declaration, the deposition testimony, including plaintiff's own testimony, and the medical record demonstrates that Pozios never acted in deliberate indifference to plaintiff's health and safety.

Pozios spends much of his lengthy brief describing the medical care provided to plaintiff, in an attempt to characterize this case as involving a mere disagreement about the course of treatment. As to the Lang declaration, Pozios also says he is not asking that the Court make a credibility determination; instead he is asking that this Court look at the deposition testimony along with plaintiff's medical records and find that Lang's declaration has no bearing on the outcome of plaintiff's claim that Dr. Pozios' decision not to renew plaintiff's medications on March 30, 2012 was a violation of plaintiff's Eighth Amendment right. According to Pozios, since there is a medically justifiable reason to withhold the medications and that is why they were withheld for 6 days, Lang's reasoning for the withholding is irrelevant. Pozios points out that the medical records show constant and continuous observation and treatment of plaintiff before and after March 30, 2012. Like the other medical staff at the correctional facility, Pozios says he was trying to do his job and render medical treatment to plaintiff; however, plaintiff was doing everything in his power to refuse treatment and not get the medication that he alleges were withheld from him. Pozios asks this Court to look at all the evidence including the medical records and deposition testimony and to

conclude that, on its face, the Lang declaration contradicts the facts, contains false

accusations against Pozios and is tantamount to a sham.[3]  Accordingly, Pozios

maintains that the document should have no bearing on the subjective component

of the 8th Amendment.  Rather, Pozios contends that the testimony and medical

records establish that he never treated plaintiff with a culpable state of mind to

hurt him by withholding his medications.  Pozios maintains that he knew plaintiff

had a mental illness and treated it professionally from March 30th to April 9th.

In response, plaintiff contends that Pozios' argument about his treatment is

not new.  Pozios supported his first summary judgment motion by averring that:

"In my medical judgment, Mr. Berkshire received appropriate and timely care

---

[3] The "sham affidavit" rule precludes a plaintiff from creating a factual issue for the purpose of defeating a motion for summary judgment by submitting an affidavit that contradicts or illegitimately supplements his or her prior deposition testimony without explaining the contradiction.  *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986).  The Sixth Circuit has stressed the importance of "distinguishing legitimate efforts to supplement the summary judgment record from attempts to create a sham issue of material fact."  *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006).  Although here the affidavit came first, Pozios tells the Court that the analysis can be done in reverse.  According to Pozios, when the totality of the circumstances, as testified in the depositions and evidenced in the medical records, is applied to the legal standard for deliberate indifference, common sense dictates that Lang's declaration not only contradicts the sworn testimony of himself, plaintiff, Pozios and Sermo, but simply does not make sense.  While minor contradictions exist between Lang's affidavit and his subsequent deposition testimony, Pozios says that Lang's affidavit is directly contradicted by plaintiff's and Pozios' deposition testimony.  Thus, Pozios maintains that Lang's affidavit was submitted to create a factual issue for the purpose of defeating a motion for summary judgment and should be precluded under the sham affidavit rule.  Plaintiff disputes the notion that the sham affidavit rule "analysis can be done in reverse."  As plaintiff correctly points out, Pozios does not cite any cases applying the sham affidavit rule to a pre-deposition, pre-summary judgment affidavit. The undersigned agrees with plaintiff that this argument makes no sense, is not supported by case law, and should be rejected.  Essentially, Pozios asks the Court to make credibility determinations based on the weight of the evidence in his favor over evidence in plaintiff's favor. That is simply not permitted on summary judgment.

and treatment for his psychiatric condition." (Dkt. 112-3, Pg ID 1341).

According to plaintiff, the Court already determined that regardless of differing

opinions on his treatment, Lang's testimony creates a triable fact issue. (Dkt. 138,

Pg ID 1962-63; Dkt. 129, Pg ID 1827-28). Plaintiff also points out that Lang's

testimony has not changed. Two different defense attorneys cross-examined Mr.

Lang, trying to get him change his version of events. (Dkt. 191-10, Lang Tr. at

4-64). According to plaintiff, Lang's testimony remains an insurmountable barrier

to summary judgment. (Dkt. 138, Pg ID 1963). Rather than concede that point,

Pozios once more "argues that the Court should believe Pozios' word over

Lang's." (Dkt. 138, Pg ID 1963; Dkt. 200, Pg ID 3832 (arguing for summary

judgment based on alleged contradictions between Mr. Lang's testimony and that

of other witnesses)). But, plaintiff points out that a "Court cannot make credibility

determinations at the summary judgment stage." (Dkt. 138, Pg ID 1963 (citing

*Peterson v. Johnson*, 714 F.3d 905, 910 (6th Cir. 2013)). Thus, plaintiff asserts

that there is nothing new here for the Court to decide, and no reason to revisit

the District Court's ruling that there is a triable issue of fact as to whether Pozios

acted with deliberate indifference. According to plaintiff, Pozios "is merely

rehashing arguments from [his] resolved motion," and "there is no reason to

readdress those claims." *Morris*, 2010 WL 728996, at *1.

      Plaintiff next contends that if the Court decides to look at Pozios' argument

on the merits, his only argument is that "Plaintiff has not satisfied the subjective component." Simply put, Pozios' position is that plaintiff received adequate treatment, and therefore no jury could conclude he acted with deliberate indifference. Plaintiff urges the Court to reject this argument. As already discussed, Lang's declaration and deposition testimony create a genuine issue of material fact as to Pozios' state of mind. Lang has declared that: "Dr. Pozios stated that [Defendants Pozios, Beauvais, and Sermo] waited weeks before they referred [Mr. Berkshire] to a Crisis Stabilization Program because they hoped that Randy Berkshire would have died," (Dkt. 115, Pg ID 1478, ¶ 9); Pozios "stated that Randy Berkshire was a 'piece of shit' and he wanted to use his death as an example to other prisoners," (*id*. at ¶ 10); "Dr. Pozios stated that they had in fact manipulated and even fabricated their documents in order to 'cover their ass,'" (*id*. at ¶ 14); Defendant Pozios "informed me that he just wanted me to testify that Randy Berkshire had admitted to me during a conversation that he was manipulating his mental illness and that all of his allegations against him, Donna Beauvais and Christopher Sermo were completely fabricated," (*id*. at ¶ 12). Lang also testified that Pozios said that he wanted plaintiff to kill himself and that he asked Lang to lie on his behalf. As the District Court has already recognized, "a reasonable jury could infer Pozios's abiding state of mind from Lang's testimony." (Dkt. 138, Pg ID 1963). And if the jury believes Lang's testimony, it could find

that Pozios had a sufficiently culpable state of mind to support a deliberate

indifference claim.  *See id.*

Plaintiff also points out that his claim against Pozios has always been about

more than just his medications.  Indeed, the operative amended complaint

specifically alleges that

> Defendant[s] Beauvais, Sermo and Pozios subjectively
> perceived that Plaintiff was at risk for suicide prior to
> April 9, 2012 . . . . The Defendants' treatment of
> Plaintiff's serious psychiatric needs was cursory and
> grossly substandard and consciously disregarded those
> needs by electing not to transfer Plaintiff to the [Crisis
> Stabilization Program], resulting in Plaintiff's attempted
> suicide on April 9, 2012.

(Dkt. 101, Pg ID 1195, ¶ 26).  Plaintiff also alleged that "Defendant[s] Beauvais,

Sermo, and Pozios' actions amounted to deliberate indifference, manifested by

their reckless disregard of a substantial risk of serious harm to Plaintiff's health or

safety, prohibited by the Eighth Amendment."  (*Id*. at Pg ID 1197, ¶ 29; *see also*

Berkshire Suppl. Aff., Dkt. 115-1, Pg ID 1614, ¶ 17).  Further, at his deposition,

plaintiff testified that this lawsuit concerned the refusal of "Pozios, Beauvais, and

Sermo" to "send me out to CSP in a timely manner." (Dkt. 191-6 at 49:10-13.)

And when asked directly "What are you claiming Doctor Pozios did that was

improper or in some manner deliberately indifferent to your health care needs?",

plaintiff's answer included that "he refused to even consider sending me anywhere

for, you know, a place where it offers a higher mental health treatment." *Id*. at

91:24-92:8.  According to plaintiff, Pozios cannot change or limit his claims simply by ignoring the record.  Ignoring the full scope of plaintiff's claims against him, Pozios appears to base his summary judgment motion on the idea that his decisions with respect to plaintiff's medications were reasonable.  (*See e.g.*, Dkt. 200, Pg ID 3807-19).

Even without Lang's testimony, plaintiff says that a jury could reasonably conclude that Pozios was indifferent to whether or not he killed himself.  Pozios recognized that plaintiff's was an extreme case: "he had already been sent out to an outside hospital. He had already been – you know, had these neurological diagnoses. He wasn't eating. He wasn't drinking. He was refusing his medications . . . ."  (Dkt. 191-5, Pozios Tr., at 49:7-10).  According to plaintiff, Sermo knew that Pozios never took Mr. Berkshire's problems seriously.  (Dkt. 191-9, Sermo Tr., at 45:24-46:1 ("Q: You believe that Dr. Pozios thought Mr. Berkshire was faking his symptoms. A: Correct.")).  Plaintiff also points to Pozios' "perverse dialogue" with Beauvais after they finally had no choice but to send plaintiff to the Crisis Stabilization Program illustrates this directly.  (Dkt. 213-5, Email Exchange, Pg ID 4562) (Beauvais: "Unfortunately, we could not transfer him to Mars so we had to send him to CSP."; Pozios: "Great. Why didn't you try the moon? It's closer.")).  Asked to explain such callous indifference, Pozios could only rationalize that his patients are "murderers, rapists, child molesters, and folks that

eviscerate themselves," so it is proper to joke about their misfortune. (Dkt. 191-5, Pozios Tr., at 47:24-48:7).

The Court agrees with plaintiff that based on all the testimony, a reasonable inference can be drawn that Pozios was deliberately indifferent to plaintiff's needs. *See Jones*, 625 F.3d at 944-45 ("deliberate indifference may be established . . . where it can be shown that a defendant rendered grossly inadequate care or made a decision to take an easier but less efficacious course of treatment"). As a matter of law, "[p]rison officials may not entirely insulate themselves from liability . . . simply by providing some measure of treatment. Indeed, deliberate indifference may be established . . . where it can be shown that a defendant rendered grossly inadequate care or made a decision to take an easier but less efficacious course of treatment." *Jones*, 625 F.3d at 944-45; *see also Comstock v. McCrary*, 273 F.3d 693, 709 (6th Cir. 2001) (absence of "actual malice or intent to harm" insufficient to defeat deliberate indifference claim). Here, expert psychologist Clark opined, based on the written evidence, that plaintiff was deprived of care "at a time when his behavior was observably worse and his need for efficient and appropriate intervention heightened." (Dkt. 183, Ex. C at 8). Simply put, "Mr. Berkshire's condition was allowed to deteriorate." *Id*. at 9. Despite the fact that "Mr. Berkshire exhibited unstable and destructive behavior," "[p]rofessional staff responded by further restricting his movements and his opportunity to get

treatment." *Id*. at 11.  Dr. Clark concluded by opining that "[t]he denial of

treatment programming and professional services options represents disregard for

Mr. Berkshire's mental illness and safety.  It does not meet the ethical, moral or

professional standard of care."  *Id*. at 12.  Then, at her deposition, Dr. Clark

confirmed her opinion that whoever was involved with him" – which certainly

includes Pozios – "was not treating him aggressively in segregation." (Dkt. 191-7,

Clark Tr., at 161).  Clark concluded that plaintiff was denied the treatment he

needed contrary to the "ethical, moral [and] professional standard of care."  (Dkt.

183, Ex. C at 12).  Plaintiff says this allows the reasonable inference that Pozios

rendered "grossly inadequate care" or chose "an easier but less efficacious course

of treatment."  *See Jones*, 625 F.3d at 944-45.  In other words, Dr. Clark's expert

opinion that Pozios and his colleagues failed to provide adequate treatment—and

the medical records that support that opinion—create a triable issue of fact,

regardless of Pozios' claims to have exercised his clinical judgment or the

opinions of his own expert.  *See Comstock*, 273 F.3d at 710.

Moreover, based on the Lang affidavit/testimony, among the other evidence,

Pozios cannot use the defense that plaintiff's claim is a "mere disagreement about

the course of treatment."  Pozios says that only plaintiff disagrees about his

decision to not medicate him immediately.  But, as plaintiff says, that decision, in

isolation, is not what this case is really about as to Pozios.  Rather, the crux of this

case is about the delay in getting plaintiff into the crisis stabilization program,
given his behaviors, including his refusal to take his medications. A delay in
access to medical attention can violate the Eighth Amendment when it is
"tantamount to 'unnecessary and wanton infliction of pain.'" *Hill v. DeKalb Reg'l
Youth Det. Ctr.*, 40 F.3d 1176, 1187 (6th Cir. 1994) (quoting *Brown v. Hughes*,
894 F.2d 1533, 1537 (11th Cir.) (*per curiam*), *cert. denied*, 496 U.S. 928 (1990)).
Further, a claim of inadequate medical treatment may state a constitutional claim if
the treatment rendered is "so woefully inadequate as to amount to no treatment at
all." *Westlake v. Lucas*, 537 F.2d 857, 860-861 (6th Cir. 1976). "A defendant
must purposefully ignore or fail to respond to a prisoner's pain or possible medical
need in order for deliberate indifference to be established." *McGuckin v. Smith*,
974 F.2d 1050, 1060 (9th Cir. 1992). The deliberate indifference standard
requires knowledge of the particular medical condition in order to establish an
intent ("a sufficiently culpable state of mind," *Wilson*, 501 U.S. at 298) to deny or
to delay purposely "access to medical care" or intentionally to interfere "with the
treatment once prescribed," *Estelle*, 429 U.S. at 104-05. Thus, "[k]nowledge of
the asserted serious needs or of circumstances clearly indicating the existence of
such needs, is essential to a finding of deliberate indifference." *Horn ex rel. Parks
v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir.), *cert. denied*, 513 U.S.
873 (1994). At a minimum, there are questions of fact for the jury regarding

whether Pozios acted with deliberate indifference with respect to the delay in treatment and the delayed transfer to the Crisis Stabilization Unit.

### 2.    Qualified Immunity

Lastly, Dr. Pozios argues that he is entitled to qualified immunity because there is insufficient evidence that he violated clearly established law.  While working for the MDOC, Pozios says he "is shielded from liability for civil damages insofar as his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818.  Moreover, if officials "of reasonable competence could disagree on whether the conduct violated the plaintiff's rights," then defendant is entitled to qualified immunity.  *Caldwell v. Woodford County Chief Jailor*, 968 F.2d 595, 599 (6th Cir. 1992).  In this case, Pozios says that plaintiff has not supported that the nonrenewal of his medication on March 30th was unreasonable in light of Dr. Pozios' concerns for plaintiff after his assessment of plaintiff's medical records and current medical condition even if you view the facts in the light most favorable to plaintiff.  Pozios points out that plaintiff's expert, Clark, finds no fault in Pozios not renewing plaintiff's medications on March 30th and supports holding them until April 6th.   Pozios' expert concurs that the treatment rendered to plaintiff by Pozios from March 30-April 9, was within the psychiatric standard of care.  Thus, Pozios says his conduct was not objectively unreasonable.

Plaintiff asks the Court to reject Pozios' claim that he is protected by qualified immunity.  In *McCullum*, a published Sixth Circuit opinion, the court held that private contract doctors like Pozios may *not* assert qualified immunity. Plaintiff asserts that Pozios misrepresents *Filarsky* and ignores subsequent binding Sixth Circuit law. In fact, contract psychiatrists like Pozios are specifically ineligible to invoke qualified immunity.  "[A] private party" may only invoke qualified immunity if (1) "there was a firmly rooted history of immunity for similarly situated parties at common law," or (2) "granting immunity would be consistent with the history and purpose of § 1983."  *McCullum*, 693 F.3d at 700 (citing *Filarsky*, 132 S. Ct. at 1662, 1667-68).  *Filarsky* held that a private attorney hired to assist a government investigation could assert qualified immunity. 132 S. Ct. at 1667.  But the Court left undisturbed the rule that privately-employed prison guards may not do so.  *Id*. (discussing *Richardson v. McKnight*, 521 U.S. 399 (1997)).  More significantly, *McCullum* specifically addressed the question of whether a privately employed physician working "as a prison psychiatrist[] can invoke qualified immunity in a lawsuit arising out of his activities at the prison." 693 F.3d at 699-700.  The court "consider[ed] whether a private doctor working for a state institution would have been immune from a suit for damages at common law" when § 1983 was passed, and also the relevant policy issues.  *Id*. at 702-04. The court concluded that "there does not appear to be any history of immunity for

a private doctor working for the government, and the policies that animate our qualified-immunity cases do not justify our creating an immunity unknown to the common law." *Id*. at 704.  Accordingly, the court held that the privately-employed prison psychiatrist was "not entitled to assert qualified immunity." *Id*.  Moreover, in *Lee*, the Sixth Circuit specifically followed *McCullum* in holding that a contractor "work[ing] as a psychiatrist at the Michigan Department of Corrections[]" – just like Pozios – was "not eligible to invoke the defense of qualified immunity."  543 Fed. Appx. at 504, 507.  As plaintiff points out, Pozios does not even mention, much less distinguish, *McCullum* or any of the related case law.  (Dkt. 200, Pg ID 3834-37).  Pozios cannot claim qualified immunity.

### 3.    Further discovery and Lang affidavit

Pozios also argues that, given the new deposition testimony provided to this Court along with the medical records, the declaration of Lang has no bearing on the Eighth amendment claim against Dr. Pozios as there is a medical reason for withholding the medication.  However, if this Court finds that Lang's declaration presents a question for the jury, then Pozios asks that the Court provide an Order allowing him to look at Lang's medical records and give Pozios an opportunity to testify as to his relationship with Lang to determine if the meeting ever occurred within the timeframe Lang alleges.  Pozios maintains that his physician-patient relationship prohibits him from defending himself against Lang's statements.

Defense counsel sought to be proactive and get authorization for the release of

Lang's health records but Lang refused to sign the release form on October 21,

2015.  As such, Pozios says that he was not given the opportunity to testify about

his relationship with Lang and Lang' motivation to write such declaration.  Thus,

Pozios has been deprived from defending himself from these "off-the-wall"

accusations that Mr. Lang has asserted in his declaration.

In response, plaintiff points out that Pozios has rejected multiple

opportunities to address Lang's testimony and the Court should not now save him

from the consequences.  With Pozios' deposition in the works, his counsel

declared that "Dr. Pozios will not be offering any testimony concerning Brent

Lang or the matters raised in the Lang Declaration, absent Lang's waiver of

privilege." (Dkt. 196-3, Letter dated October 15, 2015, Pg ID 3718).  Meanwhile,

on October 15, 2015 co-defense counsel served a subpoena on MDOC requesting

the relevant portion of Lang's records.  (Dkt. 196-4, Email dated October 15, 2015

Pg ID 3723); (Dkt. 196-5, subpoena, Pg ID 3726).  According to plaintiff, MDOC

never produced responsive documents, and Pozios apparently never followed up.

A conversation between Pozios' counsel and plaintiff's counsel followed the

October 15 communications.  (Dkt. 196-6, Email dated October 19, 2015, Pg ID

3730).  Plaintiff's counsel advised Pozios' counsel that, if Lang did not sign the

requested waiver, (Dkt. 196-3, Pg ID 3718), Pozios should seek a court order

authorizing the requested access, and that plaintiff would not oppose such a request. Thus, Pozios' deposition was postponed "to allow [him] to attempt to resolve [his] concerns" over the Lang privilege issue.  (Dkt. 196-6, Pg ID 3730; Dkt. 164, Pg ID 2089).  Defendant Pozios' counsel followed up just days later: "I do not want my client exposed to another prisoner suit—a possible claim of violation of privilege by Lang."  (Dkt. 196-7, Email dated October 23, 2015, Pg ID 3732).  And if Lang did not sign the waiver, he would "bring a motion for protective order prohibiting reference to or use of the Lang Declaration for any purpose." *Id*.  Pozios never brought that motion.  Plaintiff also points out, contrary to Pozios' assertion, declining to sign a medical records release is not at all the same as "asserting [a] physician-patient privilege."  (Dkt. 200, Pg ID 3833). Plaintiff says that there is no evidence that Lang has affirmatively attempted to assert a privilege.  Nor has Pozios offered any evidence to support his speculation that Lang will sue him if he testifies about their meeting.  Plaintiff also points out that there is no privilege for Lang to assert.  "[T]he federal courts do not recognize a federal physician-patient privilege." *Hancock v. Dodson*, 958 F.2d 1367, 1373 (6th Cir. 1992).  And federal law allows the disclosure of private medical information for litigation purposes in response to a court order, 45 C.F.R. § 164.512(e)(1)(i); in response to "a subpoena, discovery request, or other lawful process," if "reasonable efforts have been made" to ensure that "the individual

who is the subject of the protected health information that has been requested has been given notice of the request," *id*. at § 164.512(e)(1)(ii)(A); or in response to "a subpoena, discovery request, or other lawful process," if "reasonable efforts have been made" to secure an appropriate protective order, *id*. at § 164.512(e)(1)(ii)(B). But Pozios never bothered to follow through.  He never sought a court order, despite being advised to do so by plaintiff's counsel.  (Dkt. 196-6, Pg ID 3730). And, despite having given Lang actual notice of his desire for the records that would clearly have satisfied the requirements of 45 C.F.R. § 164.512(e)(1)(ii)(A), (Dkt. 196-3, Pg ID 3720), Pozios never issued a subpoena for the records and never sought a protective order covering Lang's medical records.

The Court rejects Pozios' requests for "this Court [to] provide an Order allowing Defendant [Pozios] to look at Mr. Lang's medical records and give Dr. Pozios an opportunity to testify as to his relationship with Mr. Lang." (Dkt. 200, Pg ID 3832-33).  Pozios has been aware of Mr. Lang's declaration for years and simply did not follow through on relevant discovery.  Indeed, the parties agreed to a discovery schedule and the Court approved it.  (Dkt. 164, Bench Order, June 26, 2015; Pg ID 2088; Dkt. 178, Pg ID 2340).  Pozios never sought an order regarding the privilege issue or Lang's medical records.  There is no doubt in the Court's mind that Pozios' requests are far too little and too late and no further discovery should be permitted.

F.    Defendants Beauvais and Sermo

Beauvais first contends that she lacked personal involvement in the complained of conduct, and she is, therefore entitled to qualified immunity. Beauvais had a single contact with the plaintiff on March 26. According to Beauvais, there is no evidence that she was aware of and disregarded a serious medical need. She says plaintiff alleges a single contact as to Beauvais, which occurred before his hunger strike and before any evidence of mental instability. Beauvais was not personally involved in the case management or treatment of the plaintiff. Rather, she was the unit supervisor. According to Beauvais, plaintiff is clearly suing her only in her supervisory role, which is not permissible under the clearly established law and thus, she is entitled to qualified immunity.

Beauvais and Sermo also assert that plaintiff cannot show that he had a serious medical need that was ignored, which he must do to prove his claim. Beauvais and Sermo therefore assert that they are entitled to qualified immunity. They maintain that the medical records show constant and continuous monitoring of plaintiff's care and every need he had was addressed. Plaintiff was followed by healthcare and by out-patient mental health. According to defendants, his "so-called suicide attempt was not a predictable event, and there is no evidence that Sermo and Beauvais knew of and disregarded any serious medical need." According to Beauvais and Sermo, this case involves a mere disagreement with

mental-health staff's mental-health judgments.  Plaintiff was placed on

observation status when needed, and he was followed closely by medical staff

during his short hunger strike.  Plaintiff ended his hunger strike several days prior

to the April 9 incident where he was found with a noose.  He had reported no

problems or concerns for several days, he was eating and drinking, and it appeared

as if all was well, according to defendants.  They maintain that there was no

indication that the plaintiff required some kind of severe intervention before April

9 as his mental status had clearly leveled off and was not in decline as of that date.

To prevail, the plaintiff must show that Beauvais and Sermo knew of a serious

medical need that was not met.  Defendants assert that plaintiff cannot do this

because the record clearly shows that the plaintiff was treated appropriately.

It is not clear whether Beauvais and Sermo are suggesting that plaintiff did

not have a serious medical need or whether they are only saying that plaintiff's

serious medical need was treated appropriately at all times.  To the extent they

might be arguing that plaintiff did not have a serious medical need, that issue is

foreclosed by Judge Tarnow's previous decision.  Moreover, as plaintiff points

out, it is well-established that "psychological needs may constitute serious medical

needs, especially when they result in suicidal tendencies." *Comstock v. McCrary*,

273 F.3d 693, 703 (6th Cir. 2001) (quoting *Horn v. Madison Cnty. Fiscal Ct.*, 22

F.3d 653, 660 (6th Cir. 1994)).  Thus, the Court agrees with plaintiff that he has

"an extensive history of [self-injurious behavior], as well as suicide attempts"
(Medical Record, 3/21/12, Defs.' Motion, Ex. A at 3191) and he "easily satisfies
the objective component of [his] constitutional claim." *Comstock*, 273 F.3d at
704. This component of the deliberate indifference standard does not appear to
seriously be in dispute.

The undersigned also agrees with plaintiff that Beauvais was, in fact,
personally involved in plaintiff's medical care. Beauvais admitted at her
deposition that she performed a "clinical assessment" of him on March 26, 2012.
(Dkt. 212, Ex. 1, Beauvais Tr. at 61, 63-64). Beauvais noted on March 26, 2012
that plaintiff had just been discharged from RTP – an inpatient treatment unit for
prisoners with serious mental health problems – and that his mental status
included poor reasoning, poor judgment, and poor impulse control, and that he
"express[ed] homicidal ideation." (Dkt. 193, Medical Record, Defs.' Motion, Ex.
B at 3188-89). Beauvais also participated in the treatment review meetings for
plaintiff. (Dkt. 212, Ex. 2, Sermo Tr. at 68). Thus, Beavais' "lack of
involvement" argument fails. There is no legitimate dispute regarding Beauvais'
personal involvement with plaintiff's medical care and this argument should be
rejected.

Just as with the claim by Dr. Pozios, the undersigned finds that there is
sufficient evidence in the record to allow a reasonable jury to find that plaintiff

64

was treated inappropriately based on Beauvais' and Sermo's deliberate indifference.  First, expert psychologist Karen Noelle Clark opined, based on the written evidence, that "Mr. Berkshire was medically deprived at a time when his behavior was observably worse and his need for efficient and appropriate intervention heightened."  (Dkt. 183, Ex. C at 8).  Simply put, "Mr. Berkshire's condition was allowed to deteriorate."  (*Id*. at 9).  Despite the fact that "Mr. Berkshire exhibited unstable and destructive behavior," "[p]rofessional staff responded by further restricting his movements and his opportunity to get treatment."  *Id*. at 11.  Dr. Clark concluded by opining that "[t]he denial of treatment programming and professional services options represents disregard for Mr. Berkshire's mental illness and safety.  It does not meet the ethical, moral or professional standard of care."  *Id*. at 12.  Then, at her deposition, Dr. Clark confirmed her opinion that "whoever was involved with him was not treating him aggressively in segregation."  (Dkt. 212, Ex. 6, Clark Tr. at 161).  As a matter of law, "[p]rison officials may not entirely insulate themselves from liability . . . simply by providing some measure of treatment.  Indeed, deliberate indifference may be established . . . where it can be shown that a defendant rendered grossly inadequate care or made a decision to take an easier but less efficacious course of treatment."  *Jones*, 625 F.3d at 944-45.  Dr. Clark's conclusion that plaintiff was denied the treatment he needed in violation of the "ethical, moral [and]

professional standard of care," (Dkt. 183, Ex. C at 12) supports the reasonable

inference that Beauvais and Sermo both rendered "grossly inadequate care" and

chose "an easier but less efficacious course of treatment." *See Jones*, 625 F.3d at

944-45.

Again, just as with Pozios, the declaration of Mr. Lang comes into play with

respect to these defendants. In his declaration, Mr. Lang averred that:

> 8. Dr. Pozios admitted that he, Donna Beauvais and
> Christopher Sermo knew that Randy Berkshire was
> suffering from a MMD (Major Mental Disorder) and that
> he had engaged in suicidal behaviors over the course of
> two weeks from March 26, 2012 to April 10, 2012.
>
> 9. Dr. Pozios stated that they waited weeks before they
> referred him to a Crisis Stabilization Program because
> they hoped that Randy Berkshire would have died.

(Dkt. 115, Pg ID 1478).  Then, at his deposition, Mr. Lang confirmed that

Pozios disclosed to him that Pozios, Beauvais, and Sermo jointly took action

against Mr. Berkshire.  (Dkt. 212, Ex. 7, Lang Tr. at 57-58).  Again, plaintiff

correctly points out that Judge Tarnow has already determined that, based on Mr.

Lang's testimony, "a reasonable jury could infer that Beauvais and Sermo had the

requisite culpability to satisfy the subjective prong of the test for deliberate

indifference." (Dkt. 138, Pg ID 1960).  The undersigned concludes that

defendants offer no basis for the undersigned to suggest that Judge Tarnow's

earlier determination in this regard should not stand.

Significantly, Beauvais also omits any discussion of her April 11, 2012 email exchange with Pozios.  In that exchange, Pozios remarks on Mr. Berkshire's departure from the segregation unit.  (Dkt. 212, Ex. 4).  Defendant Beauvais responds by stating: "Unfortunately, we could not transfer him to Mars so we had to send him to CSP."  *Id*.  Defendant Pozios' response: "Great. Why didn't you try the moon? It's closer."  *Id*.  The undersign agrees with plaintiff's suggestion that a reasonable jury could certainly take this "callous exchange between two people entrusted with Mr. Berkshire's well-being as further evidence" that Beauvais was acting with deliberate indifference to plaintiff's mental health needs.

For essentially the same reasons as set forth above regarding Dr. Pozios, there remain material questions of fact regarding whether defendants Beavais and Sermo were deliberately indifferent to plaintiff's serious medical needs that require these defendants' motion for summary judgment to be denied.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that plaintiff's motion for partial summary judgment against defendant Dahl be **GRANTED**, that Dahl's motion for summary judgment be **DENIED**, and that both motions for summary judgment by the remaining defendants be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2) and E.D. Mich. Local
Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further
right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health
and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some
issues but fail to raise others with specificity will not preserve all the objections a
party might have to this Report and Recommendation.  *Willis v. Sec'y of Health
and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of
Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection No. 1," "Objection No. 2,"
etc.  Any objection must recite precisely the provision of this Report and
Recommendation to which it pertains.  Not later than 14 days after service of an
objection, the opposing party may file a concise response proportionate to the
objections in length and complexity.  Fed.R.Civ.P. 72(b)(2); E.D. Mich. Local
Rule 72.1(d).  The response must specifically address each issue raised in the
objections, in the same order, and labeled as "Response to Objection No. 1,"
"Response to Objection No. 2," etc.  If the Court determines that any objections
are without merit, it may rule without awaiting the response.

Date:  March 3, 2017                              s/Stephanie Dawkins Davis
                                                  Stephanie Dawkins Davis
                                                  United States Magistrate Judge

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 3, 2017, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

<u>s/Durene Worth</u>
Acting in the absence of
Tammy Hallwood, Case Manager
(810) 341-7887
tammy_hallwood@mied.uscourts.gov